UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

GERALDINE TYLER, on behalf of
herself and all others similarly situated,

Case No. 20-cv-889-PJS-BRT
Judge Patrick J. Schiltz

Plaintiff,

v.

HENNEPIN COUNTY, and MARK V.
CHAPIN, Auditor-Treasurer, in his
official capacity,

Defendants.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

"Theft" is the colorful word Judge Kethledge of the Sixth Circuit used to describe

Michigan's practice of using small tax debts owed to the counties as a reason to pay

owners nothing for property the government takes from them. *Wayside Church v Van*

*Buren,* 847 F. 3d 812, 824 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 380 (2017)

(dissenting).  In *Rafaeli, LLC v. Wayne Cty.,* Judge Berg called the practice "a manifest

injustice."  *Rafaeli, LLC v. Wayne Cty.,* No. 14-13958, 2015 WL 3522546, at *3 (E.D.

Mich. June 4, 2015).  In *Freed v. Thomas*, Judge Friedman stated it was

"unconscionable."  *Freed v. Thomas*, No. 17-CV-13519, 2018 WL 1964669 (E.D. Mich.

Apr. 26, 2018), *vacated*, No. 17-CV-13519, 2018 WL 5831013 at *2 (E.D. Mich. Nov. 7,

2018).  Judge Friedman later elaborated: "In the Court's view, the case comes down to

1

this: Gratiot County[, Michigan] "took property worth [$100,000] to satisfy a [$2,000] debt, and then refused to refund any of the difference. In some legal precincts that sort of behavior is called theft." *Freed v. Thomas*, 2018 WL 1964669, at *5

Defendant Hennepin County, like all Minnesota counties, does the same thing. Sanctioned by statute, counties fail to pay full "just compensation" to owners of tax-forfeited properties by refusing to compensate them for forfeited properties' value in excess of the taxes owed. Judge Kethledge's striking characterization of Michigan's system—and he is not alone in his view—applies with equal force to Minnesota's.

Defendants argue that refusing to compensate owners is fair, necessary, and in line with the remedial purpose behind the subject statute. They even imply that the Plaintiff, a 92-year-old widow living alone, somehow deserved to lose her entire property; after all, she failed to respond to numerous notices and failed to pay her taxes.[1]

But the government's practice of disregarding the Takings Clause because it is owed money is unnecessary and punitive, and no amount of notice or procedural due process can compensate for this denial of just compensation. It is not "one or the other;" due process *and* just compensation are both required. Government's ability to seize and

---

[1] "Taxes" herein refers to taxes, penalties and any associated expenses. "Surplus," rather than the more common, but less well-defined, term "equity," will generally refer to the principal subject matter of this case, *i.e.*, the positive difference between the *value* of a seized property at the time of its seizure and the unpaid taxes. Surplus does *not* refer merely to the difference between the amount of the taxes and the amount the property is later sold for after the government takes it. To be clear, Plaintiff does not claim "a share of the sales proceeds." Sales of forfeited property—which do not always occur in Minnesota—can provide a measure of the property's value when it was seized, but do not otherwise figure in Plaintiff's claims.

take property not involved in a crime is conditioned by the Constitutional imperative to provide "just compensation" to the owner, regardless of the reason for the taking and no matter how much due process is provided.

## FACTS

Plaintiff Geraldine Tyler purchased a condominium at 3600 Penn Ave. North, in Minneapolis in 1999.  (Amended Class Action Complaint and Petition for Writ of Mandamus ("Compl.") at ¶ 5 [ECF No. 1-2 at 37-74].) Around ten years later, becoming concerned about her health and safety in her neighborhood, Ms. Tyler moved to a different part of Minneapolis. *Id.*  Taxes on her condominium went unpaid,[2] and Hennepin County obtained a judgment and subsequently seized the property in July 2015. The County sold the condominium in 2016 for $40,000, and the outstanding taxes and fees were approximately $15,000.  *Id.*

Hennepin County did not pay any compensation to Ms. Tyler, nor had she any way to even seek compensation. *Id.*  Instead, Hennepin County, the City of Minneapolis, and Minneapolis Public Schools each received a share of the proceeds from the sale, pursuant to Minn. Stat. sec. 282.08(4)(iii).

---

[2] As Hennepin County acknowledges, forfeiture often results from events beyond a homeowner's control.  "Owners fall into financial trouble because of job loss, a sudden and expensive medical crisis, unexpected property expenses, and other reasons. Sometimes these two processes [mortgage foreclosure and tax forfeiture] are occurring at the same time." Compl. at ¶42 (quoting http://hennepin.us/residents/property/tax—forfeited-land) (last visited August 15, 2019)).

## **ARGUMENT**

Government can take private property for public uses, including to satisfy unpaid tax obligations. And government can impose fines that are not excessive related to criminal activity.  But the Takings Clauses of the U.S. and Minnesota Constitutions require government to pay just compensation for property it takes, and the Eighth Amendment, and Art. 1, Sec 5, of the Minnesota Constitution, prohibits excessive fines.

Plaintiff has no quarrel with government taking her property or *reducing* the just compensation owed to her by the amount of taxes owed. But the government cannot use the fact it is owed money—a relatively small amount of money—to cancel its obligation to pay just compensation or reduce its just compensation obligation to zero, even if a statute allows it. Defendants cannot act as if the Constitution said "no takings without just compensation, *unless taxes have gone unpaid,"* for when they do, the impact falls disproportionally on people experiencing life and financial crises, the elderly, and those suffering under physical and mental disabilities. Compl. at ¶¶ 28, 42.

Except in the sense "money is fungible," Plaintiff does not seek a "share" of the proceeds Defendants realized when they sold her home. By the time Defendants sold Plaintiff's property, it was theirs. But Plaintiff is entitled to "just compensation" for the *net* value of what Defendants took, *i.e.,* the surplus. Defendants' failure to compensate her is a prohibited taking without compensation and results in the imposition of an unconstitutional excessive fine.

4

## I.  PLAINTIFF PROPERLY ALLEGES DEFENDANTS VIOLATED THE TAKINGS CLAUSE BY RETAINING MORE THAN THE TAXES OWED.

Takings law prevents governments from using a tax debt to avoid their obligation to pay just compensation. In *Armstrong v. United States*, 364 U.S. 40 (1960), a shipbuilder defaulted on its contract and the United States took title to unfinished ships which, under existing law, extinguished the liens of materialmen. The lienholders sued when the United States refused to compensate them.

The Supreme Court held the lienholders must be compensated, stating that their property rights did not "vanish into thin air" when the government took title. *Id.* at 48. The government could take the underlying property, subject to the "constitutional obligation to pay just compensation for the value of the liens." *Id.* at 49. Similarly, equity in property seized and sold does not "vanish" without a trace when property is forfeited; it may vanish, but it must be paid for. "The owner of the property [has] an absolute right to 'just compensation' if there is a taking." *Nika Corp. v Kansas City*, 582 F. Supp. 343, 362 (W. D. Mo. 1983).

### A.  Takings Law

The Takings Clause of the Fifth Amendment prohibits the government from taking private property for a public use without paying just compensation. U.S. Const. amend. V.  Government seizures of property, as here, are *per se* takings. *Lucas v South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) ("direct appropriation" of property or its "functional equivalent" is a classic taking). Uncompensated takings violate the

Constitution, regardless of the circumstances or the economic impact. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

 "Property" protected by the Constitution includes those interests recognized by common law, federal or state law, or that arise from custom and practice or other "background principles" of property law.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 629-30 (2001); *see also Horne v. Dep't of Agric.,* 576 U.S. 350, 135 S. Ct. 2419, 2426, 192 L. Ed. 2d 388 (2015) (Takings Clause protects property interests recognized by Magna Carta and founders); *Nixon v. United States*, 978 F.2d 1269, 1276 n.18 (D.C. Cir. 1992).

The Takings Clause protects diverse property interests from *uncompensated* government confiscation, including homes, personal property, intangible property, money, interest, liens, and mortgages. *See*, *e.g.*, *Horne*, 135 S. Ct. at 2426 (personal property); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 616 (2013), (money and real property); *Phillips v. Washington Legal Found.*, 524 U.S. 156, 168; (1998) (interest); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601-02 (1935) (mortgages).

Both common law and statutory law have traditionally treated surplus proceeds from the sale of foreclosed property as representing the former owner's equity. *See, e.g., United States v. Rodgers*, 461 U.S. 677, 690-94 (1983) (in a forced sale to recover delinquent federal taxes under 26 U.S.C. § 7403, government may not ultimately collect, as satisfaction for the indebtedness owed to it, more than the amount actually due); *Grand Teton Mountain Invs., LLC v. Beach Props., LLC*, 385 S.W.3d 499, 502 (Mo. Ct. App. 2012)  (citation omitted) ("[A] foreclosure sale surplus 'retains the character of real

6

estate for purposes of determining who is entitled to receive it' . . . Such surplus represents the owner's equity in the real estate."); *McDuffee v. Collins*, 23 So. 45, 46-47 (1898) ("the tax collector had a duty to pay the surplus to the party lawfully entitled to receive it [the owner]"); 72 Am. Jur. 2d State and Local Taxation § 911 (1974) ("surplus remaining after the payment of taxes, interest, costs, and penalties must ordinarily be paid over to the landowner."). *See also Martin v Snowden*, 59 Va. 100, 137 (1868), *sub nom.* *Bennett v Hunter*, 76 US 326; 19 L Ed 672 (1869) (discussing common law, English land tax statute, and early colonial laws); 2 William Blackstone, Commentaries on The Laws of England, *452 (If officials seize goods for delinquent taxes, "they are bound, by an implied contract in law, . . . to render back the overplus.").

### B. Defendants Violated the Takings Clause by Taking More Than Ms. Tyler Owed and Failing to Provide Just Compensation.

When the Defendants took Ms. Tyler's home, they deprived her of a constitutionally-protected property interest without compensating her, since her home was worth more than the taxes owed. This violated the established practice at common law and the Takings Clause.

The Supreme Court has found seizures such as alleged here to be facially unconstitutional. In *Lawton*, the federal government defended a tax auction process similar in result to the Defendants' process here. The Supreme Court found:

> To withhold the surplus from the owner would be to violate the fifth amendment to the constitution and deprive him of his property without due process of law or take his property for public use without just compensation. If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that.

7

*United States v. Lawton*, 110 U.S. 146, 150 (1884).  *See also Thomas Tool Servs. v. Town of Croydon*, 761 A.2d 439 (N.H. 2000) (following *Lawton*); *Bogie v. Town of Barnet*, 260 A.2d 898, 900 (Vt. 1970) ("[t]he objective is to recover taxes and costs incurred in the process of collection, not to operate a real estate business for profit."); *Lake Cty. Auditor v. Burks*, 802 N.E.2d 896, 899–900 (Ind. 2004).

In *Coleman through Bunn v. D.C.,* 70 F. Supp. 3d 58, 66-69 (D.D.C. 2014) ("*Coleman I*")*,* the court confronted a system tax forfeiture of substantially similar to Minnesota's, holding that the government's failure to compensate an owner for the surplus was a proper basis for a takings claim.  The court began by noting that in *United States v. Taylor*, 104 U.S. 216, 218 (1881), the Supreme Court interpreted a statute that permitted the federal government to engage in tax sales to recover delinquent tax debts to mean that the former owner "would be entitled to the surplus money" after the tax sale. *Id.* at 77. The court in *Coleman I* noted that "[l]ater in *United States v. Lawton*, 110 U.S. 146 (1884), an heir to an individual whose property was sold under the same statute sought "surplus proceeds of the sale," and the Supreme Court stated that "[t]o withhold the surplus from the owner would be to violate the fifth amendment to the constitution, and deprive him of his property without due process of law or take his property for public use without just compensation."  *Coleman I,* 70 F. Supp. 3d at 77 (quoting *United States v. Lawton,* 110 U.S. 146, 150 (1884)). Continuing, the court stated that the issue was "whether Mr. Coleman has a property interest in his equity and, if so, whether an

unconstitutional taking of that property has been alleged." *Id.* at 80. Concluding the

answer was "yes," the court denied the defendants' motion to dismiss. *Id.* at 81.

Minnesota law recognizes surplus as a protected property interest. In *Farnham v.*

*Jones,* 19 N.W. 83 (Minn. 1884), the Minnesota Supreme Court held that, even after a tax

sale, the property owner *continues to own* whatever portion of the property is not

necessary to pay the past due taxes and associated costs. The Minnesota Supreme Court

rejected the claim of the subsequent purchaser, who claimed ownership over the entire

parcel, on grounds that the government did not have that much title to convey.

> After the lien of the state is satisfied, any surplus realized from the sale
> must revert to the owner. The statute does not assume to condemn the
> property in the land beyond the amount due, with interest and costs. Its
> purpose and aim are to collect the revenue, and, when this is accomplished
> and a sale made, the proceeds stand in the place of the property as respects
> the land-owner's rights, and so much only can be applied to the
> indebtedness charged against the land as will satisfy it, with the expenses of
> sale; and the claim of the land-owner to the balance remains unimpaired, as
> in the case of ordinary judicial sales.

*Farnham*, 19 N.W. at 86 (citing Waples on Proceedings in Rem, § 233; Herman on

Executions, 456). This was so, the Court held, even though the act that allowed the tax

sale was, like the tax sale statute at issue in *Coleman*, silent on who owned the property

to the extent it was not needed to satisfy a tax debt.

> It is true, the act in question contains no provisions in respect to the
> disposition of the surplus proceeds of the sale. But this is immaterial; the
> right to the surplus exists independently of such statutory provision, the
> province of which would be merely to regulate the manner of enforcing the
> right.

*Id.* at 86.  *Farnham* remains good law. The current version of the subject statutes passed, as Defendants must admit, against the background of *Farnham,* contravenes the Supreme Court's holding in *Farnham.*

Defendants maintain the subject statutes erased by legislative fiat the property rights *Farnham* preserved. (Memorandum of Defendants Hennepin County and Mark V. Chapin in Support of Motion to Dismiss ("D. Br.") at 18 [ECF No. 13]).  The statute does not explicitly state its intent to effect such a legislative erasure however and, even if it did, it is of no force or effect. *Webb's,* discussed in more detail below (*infra* at 18), holds that government cannot "by *ipse dixit* . . . transform private property into public property without compensation."[3]

State tax statutes are not the only source from which property rights arise. *Palazzolo*, 533 U.S. at 629-30.  In fact, "the right to the surplus exists independently of such statutory provision." *Farnham, 32 Minn.* at 12, 19 N.W. at 86. Minnesota consistently treats equity as property.  *See, e.g.*, *Batsell v. Batsell*, 410 N.W.2d 14, 15 (Minn. Ct. App. 1987) (recognizing equity as proper subject of marital property division). And Minnesota provides for a "homestead" exemption in bankruptcy that protects the property interest in home equity. Minn. Stat. § 510.01.  *See also, In re Haggerty*, 448 N.W.2d 363, 367 (Minn. 1989) (citations omitted):

> This state has long recognized the importance, notwithstanding the just demands of creditors, for a debtor's home to be a 'sanctuary.' This 'wise and humane policy' is not just for the debtor's benefit, but is also 'in the

---

[3] Defendants attempt, in a footnote and lacking any authority, to distinguish *Farnham* on the grounds that it involved sale of a tax certificate. However, *Farnham* does not premise its decision on that "fact," or mention a right of redemption.

interest of the state, whose welfare and prosperity so largely depend upon
the growth and cultivation among its citizens of feelings of personal
independence, together with love of country and kindred-sentiments that
find their deepest root and best nourishment where the home life is spent
and enjoyed.'

The court in *Coleman* acknowledged such sources as creating a property interest in home

equity. *Coleman through Bunn v. D.C.,* No. CV 13-1456 (EGS), 2016 WL 10721865, at

*3 (D.D.C. June 11, 2016) ("*Coleman II*").

Ms. Tyler's claim is consistent with settled principles of takings law. Defendants'

confiscation of her surplus without compensation contravenes *Armstrong v. U.S.*, 364

U.S. 40, 49 (1960), a case Defendants cite with approval for the very proposition that

undercuts their argument. (D. Br. at 12.) There, the Supreme Court explained the essence

of an unconstitutional taking is forcing a few people to "bear public burdens which, in all

fairness and justice, should be borne by the public as a whole." *Id. See also Wensmann

Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 633 (Minn. 2007); *Westling v. County of

Mille Lacs*, 581 N.W.2d 815, 823 (Minn. 1998) (quoting *Zeman*, 552 N.W.2d at 552).

Defendants' actions shift onto Ms. Tyler a disproportionate share of an overall tax

burden that should be apportioned uniformly among all taxpayers as required by

Minnesota's Constitution. *See* Minnesota Constitution, Art. 10, Sec. 1. "[T]axes must be

uniform upon the same class of subjects and will be levied for public purposes."

Minnesota Property Tax Administrator's Manual, Module 1, General Property Tax Law,

https://www.revenue.state.mn.us/sites/default/files/2019-06/ptamanual_module1_3.pdf at

11. Ms. Tyler's "fair share" of the tax burden is measured by the taxes due. Confiscation

of her surplus—and the other surpluses Defendants retain—results in a small group of

individuals subsidizing the taxpaying public.

The fairness principles of *Armstrong* are well-settled.  In Justice Cooley's treatise

on taxation (cited by the Minnesota Supreme Court in *Farnham*, 19 N.W. at 85), Justice

Cooley discusses the distinction between eminent domain, *i.e.,* takings, and the

government's taxing power:

> Taxation [also] takes property from the citizen for public use, but it does so
> under general rules of apportionment and uniformity, so that each citizen is
> supposed to contribute his fair share to the expenses of government, and be
> compensated for doing so in the benefits which the government brings him.
> [But under eminent domain] 'something exceptional' is taken. 'The case,
> therefore, is not one in which there can be and apportionment of the burden
> as between the citizen whose property is taken, and the body of the
> community, and compensation to him of a pecuniary nature must therefore
> be made.'

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of

America* 333-34 (Little, Brown & Co. 1880). What happened to Ms. Tyler was

"something exceptional." It was not a "uniform apportionment," which is the measure of

her fair share of the cost of the benefits government provides. Defendants can hardly

deny Plaintiff's surplus is used to subsidize County expenses. Defendants concede that, if

not sold, forfeited properties can be used as public parks; if sold, they finance public

schools, among other public endeavors.  (D. Br. at 10.)

Minnesota's tax forfeiture law creates a perverse incentive for counties to

foreclose desirable properties such as people's homes to boost their budgets, using

confiscated surpluses to fund government functions that should be funded with taxation.[4]
The supreme courts of New Hampshire, Vermont, and Mississippi have all held that
refusals to compensate for the surplus violate the constitutional takings without just
compensation prohibition.  *Thomas Tool Services*, 145 N.H. at 220; *Bogie*, 129 Vt. at 55
(retention of excess funds from sale of foreclosed land "amounts to an unlawful taking
for public use without compensation"); *Griffin v. Mixon*, 38 Miss. 424, 436-37 (Miss. Err.
& App. 1860) (violation of due process and just compensation guarantee); *see also
Coleman I*, 70 F. Supp. 3d 58 at 80 (takings claim appropriate if D.C. law elsewhere
recognizes property right in equity); *Coleman II*, No. 13-1456, 2016 WL 10721865 at *3
(recognizing D.C. law treats equity as a form of property in other contexts and thus
takings claim should proceed to the merits); *King v. Hatfield*, 130 F. 564, 579 (C.C.D.W.
Va. 1900). *See also McDuffee*, 117 Ala. at 491; *Stierle v. Rohmeyer*, 260 N.W. 647, 652
(Wis. 1935) (government could not constitutionally penalize mortgagee by extinguishing
the entire mortgage, because "the legislature . . . had no authority" to do so "without a
just compensation").

---

[4] In suggesting forfeitures are "just another tax," Defendants cite *Speed v. Mills*, 919 F.
Supp. 2d 122, 129 (D.D.C. 2013), for the proposition that forfeited properties are not
"taken for a public purpose; rather [they are sold] … because of taxes that [were]… not
paid." (D. Br. at 12.) For the reasons spelled out in Justice Cooley's treatise, forfeitures
imposed on a small subset of taxpayers are not a tax. *See also Eastern Ky. Coal Lands
Corp. v. Common*, 127 Ky. 667 (Ky. Ct. App. 1907) ("The forfeiture is not a tax. Nor is it
the equivalent. It is a penalty imposed for a violation of a statute." And Defendants' logic
is unsound. It is akin to a government arguing it doesn't have to pay for property used to
build a road because the property was not taken for a public purpose; it was taken
because the owner refused to voluntarily vacate it.

13

### 1.  Defendants' Failure to Compensate for the Surplus is Not Justified by Minnesota's Extensive Government Bureaucracy.

Defendants provide a detailed discussion of Minnesota's complicated real estate tax system. (D. Br. at 2-10.)[5] Defendants claim it represents a "balance [between] the competing interests of property owners … [and] the state and units of local government that rely on property taxes to fund government services," (*id*. at 3) and, as result, this Court should "decline Plaintiffs' invitation to make core policy decisions."  *Id*. at 20-21.

Notably, however, the State of Minnesota, which has a right to intervene in any case where the constitutionality of a statute is questioned, has not appeared to defend the "balance" supposedly represented by the complicated statutes in question. Minn. R. Civ. P. 5A (2). And in any event, Defendants' reliance on complexity does not advance their cause. The machinations of the subject statute are irrelevant. Plaintiff's claims stem from a simple, and undisputed, reality: unpaid property taxes lead inexorably to a complete loss of the property and all the equity in it, *with no compensation paid to the owner*, regardless of how small the unpaid taxes.  Defendants' efforts to justify taking all the surplus from the sale of Ms. Tyler's property by blaming her for not redeeming the property are also irrelevant. (D. Br. at 13 n.8, 18, 19.) Defendants are not constitutionally

---

[5] Hennepin County admits that "Minnesota's property tax system is … one of the most complex in the country." 2016 Hennepin County Budget, *available at* https://www.hennepin.us/-/media/hennepinus/your-government/budget-finance/documents/operating-budget-book-2016.pdf?la=en&hash=41FD4B0E6F4DA707B0ABCCD46F58836D7479FE8B (last visited May 21 2020).

entitled to take her property without paying for it, no matter how many opportunities they provide for property owners to pay the delinquent taxes.

Our system of checks and balances requires court intervention when the legislature exceeds constitutional limits on its powers. Plaintiff does not seek to "upset the applecart" of Minnesota's Brobdinagian tax system. It can remain intact; it just needs a mechanism to pay property owners the difference between the value of their forfeited property and the taxes they owe, as many other states have done.[6]

### 2. The State Being Title Owner is Irrelevant When the County Sells Forfeited Properties. Plaintiff Does Not Complain About Defendants' *Sale* of the Property.

Defendants argue that, by the time they sell forfeited properties, title has already passed to the state. (D. Br. at 13.)  But Plaintiff is not objecting to Defendants taking her property, its sale, nor, technically speaking, is she claiming a share of the sale proceeds, as plaintiffs in other similar cases have done. Rather, Ms. Tyler claims Defendants divested her of title and took her property and did not compensate her for *any* of it, all of which occurred *before* Defendants sold her property.

---

[6] Defendants' claim that finding the forfeiture statute unconstitutional would be "unfair" and "impracticable" (D. Br. at 20) is belied by more than twenty states that guarantee some compensation, *e.g.,* by paying surplus proceeds from the sale of tax-indebted property to former owners.  *See* Ala. Code § 40-10-28; Ark. Code § 26-37-209; Conn. Gen. Stat. § 12-157(h); Del. Code tit. 9 § 879; Fla. Stat §§ 197.522, 197.582; Ga. Code Ann. § 48-4-5; Idaho Code § 31-608(2)(b); Kan. Stat. § 79-2803; Ky. Rev. Stat. § 426.500; Me. Rev. Stat. tit. 36 § 949; Mo. Rev. Stat. § 140.340; Nev. Rev. Stat. § 361.610.5; Ohio Rev. Code § 5723.11; 72 Pa. Cons. Stat. Ann. § 1301.19-20; ; S.C. Code Ann. § 12-51-130; S.D. Code § 10-22-27; Tenn. Code Ann. § 67-5-2702; Va. Code Ann. § 58.1-3967; Wash. Rev. Code Ann. § 84.64.080; W. Va. Code § 11A-3-65; Wis. Stat. § 75-36(4) (homesteads); Wyo. Stat. § 39-13-108(d)(4).

Defendants' argument boils down to a claim that solely because the relevant statute operates to give the surplus to the government, Plaintiff's right to compensation for its taking evaporates. This argument, however, runs afoul of a fundamental principle that government cannot simply redefine preexisting private interests as public property. In *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980), the Supreme Court held that "[n]either the Florida Legislature by statute, nor the Florida courts by judicial decree, may [take the interest on private funds deposited in court] by recharacterizing the principal as 'public money' because it is held temporarily by the court."  Government cannot "by *ipse dixit* . . . transform private property into public property without compensation.")  *Id*.; *see also Lucas,* 505 U.S. at 1014 ("[T]he government's power to redefine" property rights is "necessarily constrained" by the Constitution); *Phillips*, 524 U.S. at 167 ("a State may not sidestep the Takings Clause by disavowing traditional property interests"); *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot*., 560 U.S. 702, 713 (2010) (states effect a taking by "recharacterizing" traditionally private property as public property).

### 3.  Defendants' Cases Do Not Support Their Arguments.

The takings cases cited by Defendants (D. Br. at 16-19) are not from Minnesota or within the Eighth Circuit and, fail to provide a convincing rationale for allowing Defendants' practices.

In *Nelson v. City of New York,* 352 U.S. 103 (1956), New York took plaintiffs' property via state tax sale procedures to pay overdue water bills. *Id*. at 105- 06. The dispossessed owners brought a takings challenge because the city kept the excess

16

proceeds from these sales. *Id*. at 109. But, unlike this case, the New York statute allowed

dispossessed owners to recover the surplus by claiming it in the foreclosure proceedings.

*Id.* at 110.  Courts have recognized the significance of the distinction between *Nelson* and

cases like this one, including *Automatic Art, L.L.C. v. Maricopa County*, No. CV 08-

1484-PHX-SRB, 2010 WL 11515708 *6 (D. Ariz. 3/18/10), cited by Defendants. (D. Br.

at 16.)  Minnesota's Act offers no opportunity for owners to claim the surplus proceeds.

And in Michigan, the District Court decision in *Wayside Church v. Van Buren*, No. 0:14-

CV-1274 2015 WL 13308900, at *8 (W.D. Mich. Nov. 19, 2015), vacated on other

grounds *sub nom Wayside Church v. Van Buren*, 847 F. 3d 812 (6th Cir. 2017) has been

stayed pending the Michigan Supreme Court's decision in *Rafaeli,* 2015 WL 3522546, at

*8-10 (see Dkt. No. 64), which should determine whether surplus arising from the

forfeiture and sale belongs to the owner within the Sixth Circuit.

Defendants' other cases are also distinguishable.  Some do not even involve

takings claims. *See*, *e.g., Kelly v. City of Boston*, 204 N.E.2d 123 (Mass. 1965), which

involved only interpretation of a state statute, and *Auburn v. Mandarelli*, 320 A 2d 22,

25-30 (Maine 1974), which involved due process claims. Others, like *Ritter v. Ross*, 558

N.W.2d 909, 912 (Mass. App. Ct. 1996), involved claims regarding proceeds of a post-

forfeiture sale, an issue not before the court here. *Balthazar v. Mari Ltd*, 301 F. Supp. 103

(N. D. Ill. 1969), *aff'd without discussion,* 396 U.S. 114 (1969) is a decision from a

District Court in a different Circuit which focuses on due process issues not present in

this case and addresses the takings issue only in passing, in a footnote. *Coleman I,* 70 F.

Supp. 3d at 79-80. *Reinmiller v. Marion County, Or*., No. 05-1926-PK, 2006 WL

17

2987707 (D. Or. Oct.16, 2016), ruled for the defendant because Oregon law did not give the owner a property right in the surplus.  And *Reinmiller* relies on *Nelson v. City of New York,* 352 U.S. 103 (1956), but ignores that the statute upheld in *Nelson a*llowed the defendant "to foreclose real property … and in the absence of timely action to redeem or to recovery [sic] any surplus, retain the property or the entire proceeds of its sale." *Nelson v. City of New York*, 352 U.S. 103, 110, (1956).  Here, the subject statute does not provide a mechanism to redeem or recover any surplus.  Finally, as *Coleman I* noted, 70 F.3d at 80, *Reinmiller*, like *City of Auburn* and *Ritter*, recognized that if, as here, state statutes or constitutions recognize a property right, a takings claim could be stated. *Reinmiller*, 2006 WL 2987707, at \*3; *City of Auburn*, 320 A.2d at 32; *Ritter*, 558 N.W. 2d at 912–13.

### 4.  The Legislature is Not the Only Body that Can Remedy the Unfairness of Minnesota's Tax Forfeiture System.

Defendants argue the unfairness of their failure to pay for the surplus represents a policy-based decision that can only be revisited by the legislature. (D. Br. at 18, 20.)[7]

---

[7] Defendants removed this case from state court. Plaintiff does not contest federal jurisdiction, and believes that neither the Tax Injunction Act, 26 U.S.C. §7421 ("TIA") ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.") nor principles of comity divest this court of jurisdiction. *See Coleman through Bunn v. D.C.,* 70 F. Supp. 3d 58, 66-69 (D.D.C. 2014) (rejecting jurisdictional challenge); *see also Nat'l Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 588 (1995) (discussing comity). *But see, Wayside Church* v. *Van Buren*, 847 F. 3d 812 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 380 (2017) (dismissing for lack of jurisdiction) (cited by Defendants, D. Br. at 15-16).  If the Court believes additional briefing on these issues is appropriate, Plaintiff will be happy to oblige.

18

However, almost all statutes balance policies, but that doesn't make them immune from scrutiny under the constitution. And this statutory scheme is not just unfair, it is unconstitutional.  If the legislature addresses the problem, this case may become moot; but, until then, it should proceed.[8]

Defendants argue Plaintiff's complaint should be dismissed because, if Plaintiff wins, it may give rise to collateral hypothetical questions involving rights of lienholders. (D. Br. 20.)  These hypothetical questions are off-topic and would not even arise unless Plaintiff prevails and are, in any event, solvable as evidenced by the many states whose statutes protect the surplus property interest of owners whose homes are forfeited.[9]

## C.  Forfeiture Precedent Does Not Avail The Defendants.

Defendants claim that failing to compensate Plaintiff for the surplus is a permissible civil forfeiture, citing *Bennis v. Michigan*, 516 U. S. 442, 452-3 (1996), and *Lukkason v. 1993 Chevrolet Extended cab Pickup*, 590 N. W. 2d 803 (Minn. Ct. App. 1999). (D. Br. at 14-15.) But Defendants are wrong: *Bennis* and *Lukkason* are inapposite and do not legitimize Ms. Tyler's uncompensated loss.

The Supreme Court has cautioned against forfeiture, holding that they "are not favored; they should be enforced only when within both letter and spirit of the law." *United States v. One 1936 Model Ford V-8 DeLuxe Coach*, 307 U.S. 219, 226 (1939).

---

[8] In *Ramos v. Louisiana*, ___ S. Ct. ___, 140 S.Ct. 1390, 1396 (2020), the Supreme Court just recently invalidated Louisiana's practice of allowing non-unanimous juries in criminal cases, even though the Louisiana legislature could easily have changed the statute to conform with the Constitution.

[9] *See* footnote 6, *supra*.

This is true especially when, as here, the government is the beneficiary of the forfeiture. "[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit." *Harmelin v. Michigan,* 501 U.S. 957, 978 n.9 (1991) (Scalia, J., plurality opinion). *See also Sogg v. Zurz*, 121 Ohio St. 3d 449, 451; 905 N.E.2d 187 (2009) (Fairness and justice instruct that courts should "favor individual property rights when interpreting forfeiture statutes.").

Minnesota law is similar. "The Minnesota Supreme Court has recognized that the punitive nature of forfeiture requires that forfeiture law be interpreted strictly." *Peterson v. 2004 Ford Crown Victoria*, 792 N.W.2d 454 (Minn. Ct. App. 2010) (citation omitted).

> [T]hese laws are disfavored and will only be enforced when the claim is "within both letter and spirit of the law." *Id*. (quoting *United States v. One 1936 Model Ford V-8 De Luxe Coach, Motor No. 18-3306511*, 307 U.S. 219, 226, 59 S. Ct. 861, 865, 83 L. Ed. 1249 (1939)). Because of the punitive and disfavored nature of the forfeiture laws this court is to "strictly construe its language and resolve any doubt in favor of the party challenging it." *Id.*

*Schug v. Nine Thousand Nine Hundred Sixteen Dollars & Fifty Cents in U.S. Currency,* 669 N.W.2d 379, 382 (Minn. Ct. App. 2003).

A "cautious" and strict approach to Minnesota's real estate tax forfeiture system reveals that although the word "forfeiture" appears in the Minnesota tax statutes and in the criminal forfeiture statutes at issue in *Bennis* and *Lukkason*, the similarity ends there. The concepts at work are different, and it is inappropriate to export criminal precedent into a purely civil arena. Indeed, Judge Shapiro made such a distinction between civil and criminal forfeitures in his concurrence in the Michigan Court of Appeals' decision in

*Rafaeli, LLC v. Oakland Cty.,* No. 330696, 2017 WL 4803570, at *5 (Mich. Ct. App. Oct. 24, 2017):

> [T]he majority [which ruled a forfeiture permissible] implicitly concludes that all "forfeitures" are equal under the law, whether based upon a criminal enterprise or a property owner's failure to pay $8.41 in taxes. I respectfully disagree, and suggest that the substance and not the nomenclature should control. I think that this case bears little, if any, relation to *Bennis*, and that it is a mistake to conclude that *Bennis* addresses, let alone controls, the issues in this case.

A cautious approach also reveals relevant differences between the criminal forfeiture statutes at issue in *Bennis* and *Lukkason,* and the civil forfeiture at issue here. The main purpose of the criminal forfeiture statutes in *Bennis* and *Lukkason* was to remedy, deter or punish criminal conduct.  The Supreme Court has only tolerated civil forfeitures when the property is associated with criminal activity, *Austin v. United States*, 509 U.S. 602, 609-10 (1993). The relevant Minnesota statute provides:

> [S]ections 609.531 to 609.5318 must be liberally construed to carry out the following remedial purposes: (1) to *enforce the law*; (2) to deter *crime*; (3) to reduce the economic incentive to engage in *criminal* enterprise; (4) to increase the pecuniary loss resulting from the detection of *criminal* activity; and (5) to forfeit property *unlawfully used* or acquired and divert the property to law enforcement purposes.

Minn. Stat. § 609.531, subd. 1a. (emphasis added.) None of these purposes applies to Ms. Tyler's takings claim. She never was a criminal. Her home was not obtained from criminal activity, nor was it used for criminal activity.[10]

---

[10] See, *e.g.,* "Forfeiture is the process that a state agency uses to seize (take) property from an owner after someone is arrested, charged, or convicted of a specific crime. Usually this happens when someone is arrested by law enforcement for driving a motor vehicle while under the influence of controlled substances (drugs) or alcohol or after fleeing a police officer in a motor vehicle." Minnesota Judicial Branch, Forfeiture

In *Bennis*, the police seized a car used to facilitate the crime of prostitution, and then sold it pursuant to a Michigan civil forfeiture statute that allowed confiscation of the car as a remedy for its illicit use.  516 U.S. at 443-44.  At issue was whether the government could keep the entire proceeds of the sale, including the interest claimed by its innocent co-owner. The Court upheld the forfeiture of the entire car because the innocent co-owner "entrusted" it to the co-owner who used it for criminal activity. Justice Thomas, concurring, noted that the decision rested on the car's role as "an "instrumentality" of the crime. *Id*. at 453-55.  It is also significant that the statute in that case functioned remedially. The proceeds from selling the car ($600) did not measurably exceed the costs of seizing and selling it, and thus of enforcing the anti-prostitution law. *Id.* at 457-58 (Ginsburg, J., concurring).

*Bennis* stands in contrast to this case, where even after deducting all penalties and costs, the surplus value of Ms. Tyler's home was substantial. Defendants argue Plaintiff received ample procedural due process, but this is not at issue in Plaintiff's Complaint. Furthermore, the federal and Minnesota Constitutions do not allow uncompensated takings merely because the government provides appropriate due process.

Defendants also complain about the "unfairness" of their not being able to pursue owners for a deficiency when their properties are worth less than taxes owed. (D. Br. at 20.) But this is beside the point, as it does not deal with any allegation of Plaintiff's

---

and Impoundment, http://www.mncourts.gov/Help-Topics/Forfeiture-and-Impoundment.aspx.  (last visited May 21, 2020).

complaint. And, of course, Ms. Tyler's property had a surplus following its seizure and sale.

## II.    PLAINTIFF PROPERLY PLEADS A CLAIM FOR EXCESSIVE FINES.

The Excessive Fines Clauses of the Minnesota and United States Constitutions are identical and prohibit the imposition of excessive fines.  U.S. Const. amend. VIII, Minn. Const. art. 1, § 5.

The Supreme Court recently confirmed that the Eighth Amendment's protections against excessive fines apply to the states through the Fourteenth Amendment.  *Timbs v. Indiana*, ___ U.S. ___, 139 S. Ct. 682, 686–87 (2019).  Justice Thomas stressed the following in his concurring opinion:

> The right against excessive fines traces its lineage back in English law nearly a millennium, and from the founding of our country, it has been consistently recognized as a core right worthy of constitutional protection. As a constitutionally enumerated right understood to be a privilege of American citizenship, the Eighth Amendment's prohibition on excessive fines applies in full to the States.

*Id.* at 698 (Thomas, J., concurring).

When interpreting the Minnesota Constitution, Minnesota courts should not reject a United States Supreme Court interpretation of identical or substantially similar language "merely because one prefers the opposite result."  *Women of the State of Minn. by Doe v. Gomez,* 542 N.W.2d 17, 30 (Minn.1995).  For federal constitutional claims, courts look to the Supreme Court for analysis and begin with the observation that the Eighth Amendment does not limit an excessive fines challenge to exclusively criminal proceedings.  *Austin v. United States*, 509 U.S. 602, 607–09 (1993).  And, although it was

23

in the context of determining if a tax violated the Double Jeopardy Clause of the Eighth

Amendment, the Supreme Court observed:

> [W]e have repeatedly examined taxes for constitutional validity. We have
> cautioned against invalidating a tax simply because its enforcement might
> be oppressive or because the legislature's motive was somehow suspect.
> Yet we have also recognized that "there comes a time in the extension of
> the penalizing features of the so-called tax when it loses its character as
> such and becomes a mere penalty with the characteristics of regulation and
> punishment."

*Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 779 (1994) (internal

citations omitted).

Minnesota courts have followed suit.

> We draw from the discussion in *Austin* that a civil sanction, such as the
> Commissioner's assessment of liability in this case, is a "punishment" that
> implicates the Excessive Fines Clauses of the United States and Minnesota
> Constitutions when the sanction cannot fairly be said to serve a solely
> remedial purpose but rather can only be explained as serving either
> retribution or deterrent purposes as well.

*Wilson v. Comm'r of Revenue*, 656 N.W.2d 547, 553 (Minn. 2003).

Finally, as discussed above, the Supreme Court recently recognized that additional

scrutiny should be given to cases where the government stands to benefit:

> Even absent a political motive, fines may be employed "in a measure out of
> accord with the penal goals of retribution and deterrence," for "fines are a
> source of revenue," while other forms of punishment "cost a State money."
> *Harmelin v. Michigan*, 501 U.S. 957, 979, n. 9, 111 S.Ct. 2680, 115
> L.Ed.2d 836 (1991) (opinion of Scalia, J.) ("it makes sense to scrutinize
> governmental action more closely when the State stands to benefit"). This
> concern is scarcely hypothetical. *See* Brief for American Civil Liberties
> Union et al. as Amici Curiae 7 ("Perhaps because they are politically easier
> to impose than generally applicable taxes, state and local governments
> nationwide increasingly depend heavily on fines and fees as a source of
> general revenue.").

24

*Timbs*, 139 S.Ct. 682, 689 (2019).  With the forfeiture statute at issue in this case, the

government stands to benefit to the detriment of property owners,[11] and thus stricter

scrutiny is appropriate.[12]

### A. Retaining Surplus Funds or Value After the Government Has Been Fully Compensated is Not Remedial

Hennepin County, relying upon *Austin*, claims that the forfeiture statute is purely

remedial and thus does not violate the Eighth Amendment. (D. Br. at 21-24.)  But

Defendants fail to discuss *Austin's* analysis of when a "remedial" fine or forfeiture

***becomes*** "punitive."

> [W]e are mindful of the fact that sanctions frequently serve more than one purpose. We need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine that it can only be explained as serving in part to punish. We said in *Halper* that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also *serving* either retributive or deterrent purposes, is punishment, as we have come to understand the term."

*Austin,* 509 U.S. at 610 (citing *United States v. Halper*, 490 U.S. at 448); *see also Sabri*

*Properties, LLC v. City of Minneapolis*, No. 18-CV-3098 (MJD/HB), 2019 WL 2052597

at *2 (D. Minn. May 9, 2019) ("[E]ven if there is some remedial purpose, the fine may

still be considered a punishment subject to the restrictions of the Excessive Fines Clause

if it 'cannot fairly be said solely to serve a remedial purpose, but rather can only be

---

[11]Pursuant to Minn. Stat. sec. 282.08(4)(iii), Hennepin County, the City of Minneapolis, and Minneapolis Public Schools each received a share of the proceeds from the sale of Ms. Tyler's residence.

[12] Defendants argue that certain "facts" will result in individualized fact finding.  (D. Br. at 21.) That issue, which Plaintiff disputes, is an issue for class certification.

explained as also serving either retributive or deterrent purposes.'") (internal citations omitted).

The Supreme Court effectively expanded the applicability of the "excessive fine" limitations to encompass "in kind" punishments like *in-rem* civil forfeitures. Thus, the excessive fine prohibition "cuts across the division between the civil and the criminal law." *Austin,* 509 U.S. at 610 (quotation and citation omitted). This court must determine whether the forfeiture in question is primarily remedial or crosses the line into punishment. Plaintiff asserts that the forfeiture of the surplus is not remedial, but punitive.

The *Austin* Court considered whether, in conjunction with criminal prosecution for drug violations, the forfeiture of defendant's mobile home and auto body shop violated the Excessive Fines Clause. *Austin*, 509 U.S. at 604. The Court explored the history of the Eighth Amendment and concluded:

> [E]ven though this Court has rejected the "innocence" of the owner as a common-law defense to forfeiture, it consistently has recognized that forfeiture serves, at least in part, to punish the owner. *See Peisch v. Ware*, 4 Cranch, at 364 ("[T]he act punishes the owner with a forfeiture of the goods") . . . . More recently, we have noted that forfeiture serves "punitive and deterrent purposes," . . . and "impos[es] an economic penalty". . . We conclude, therefore, that forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment.

*Id.* at 618 (some internal citations omitted). The court rejected the claim that the statute was remedial, holding that "forfeiture of property ... [is] a penalty that ha[s] absolutely no correlation to any damages sustained by society or to the cost of enforcing the law." *Id.* (citing *United States v. Ward*, 448 U.S. 242, 254 (1980)).

26

Likewise, in *Bajakajian* 524 U.S at 328-29, the government attempted to seize $357,144 from a defendant who failed to comply with a statute requiring persons to report the transport of more than $10,000 out of the country.  524 U.S. at 324-25.  The government claimed that the statute was remedial because, among other things, one of the goals of the statute at issue was to "dete[r] illicit movements of cash."  *Id.* at 328-29.  The Supreme Court rejected that claim because "[d]eterrence . . . has traditionally been viewed as a goal of punishment, and forfeiture of the currency here does not serve the remedial purpose of compensating the Government for a loss."  *Id.* at 329 (citing Black's Law Dictionary 1293 (6th ed. 1990) for the proposition that "[R]emedial action" is one "brought to obtain compensation or indemnity")); *see also One Lot Emerald Cut Stones v. United States*, 409 U.S. 232 (1972) (*per curiam*) (monetary penalty was remedial because it compensated the Government for lost revenues).  As these cases demonstrate, a statute is "remedial" if its goal is to compensate the government for lost revenues.

The Supreme Court in *Timbs* recently refused to revisit these holdings: "We thus decline the State's invitation to reconsider our unanimous judgment in *Austin* that civil *in rem* forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive."  *Timbs*, 139 S.Ct. 690.

The Minnesota Supreme Court has found a statute that the government claimed was remedial violated the Excessive Fines Clause.  *See Wilson v. Comm'r of Revenue*, 656 N.W.2d 547 (Minn. 2003).  Although in that case the government was trying to assess the fine against a third party, the court noted, "[a]ssessing 100 percent of an employee's unpaid taxes against an employer or a corporate officer for failure to remit a

27

fraction of that amount cannot be purely remedial . . . because, as in this case, the Commissioner stands to receive substantially more from the employer than he is entitled to receive under the wage levy." *Id.* at 553.

In this matter, the government's loss is clear: Plaintiff failed to pay her property taxes and by the time the county sold her property, the outstanding tax debt was approximately $15,000.  If this statute was purely remedial, defendants would have taken no more than that amount and refunded the surplus to Ms. Tyler.  Instead, Defendants kept an additional $25,000, nearly **200%** of what Ms. Tyler owed**.**  Thus, this statute does not serve the remedial purpose of "compensating the government for a loss."

Defendants cite numerous cases to explain that tax penalties are remedial, but those cases are distinguishable.  First, defendants' "insurmountable wall" of cases all analyze defendants who allegedly violated federal tax statutes.  *See, e.g., Helvering v. Mitchell*, 303 U.S. 391 (1938) (challenging tax penalty imposed by Commissioner of Internal Revenue for violating federal tax laws); *McNichols v. Comm'r of Internal Revenue*, 13 F.3d 432 (1st Cir. 1993) (challenging IRS penalties on unreported income from illicit activities); *Little v. Comm'r of Internal Revenue*, 106 F.3d 1445, 1455 (9th Cir. 1997) (challenging IRS penalty imposed for understating taxes owed on tax return); *Dewees v. United States*, 272 F. Supp. 3d 96 (D.D.C. 2017), *aff'd*, 767 F. App'x 4 (D.C. Cir. 2019) (challenging IRS penalty for failing to pay federal income taxes).  None of these cases analyze property tax statutes that require forfeiture of a person's home for noncriminal activity (frequently, a small amount of unpaid taxes).

28

Second, Defendants fail to recognize that Ms. Tyler had already been charged for associated taxes, fees, penalties, and interest, none of which she is challenging. *See*, Minnesota Department of Revenue, Delinquent Tax and Tax Forfeiture Manual "Red Book", p. 11, *available at* https://www.revenue.state.mn.us/sites/default/files/2020-04/Delinquent%20Tax%20and%20Tax%20Forfeiture%20Manual%20-%20April%202020.pdf (last visited May 21, 2020) (describing "Penalties Added to Delinquent Taxes"), *id*. at p. 10 (describing the interest charged on delinquent taxes), and *id*. at pp. 40-41 (describing "Service Fees," and defining the "total delinquent tax amount" as including the "delinquent tax, special assessments . . ., penalties, interest and the service fee.").

On top of the unpaid taxes, the property owner is assessed penalties and costs, and is also charged interest on the entire amount until the property is sold.  Here, Plaintiff claims only that the additional "penalty" imposed by the Defendant refusing to refund her the surplus value of her property—in this case, nearly 200% of the amount owed—was excessive.  Thus, the tax penalties that have been upheld in the cases cited by Defendant[13] are dwarfed by the penalties imposed by the statute in this case.

---

[13] *See, e.g., Helvering v. Mitchell*, 303 U.S. 391 (1938) (upholding a 50% penalty for defendant who made fraudulent deductions on tax bill); *Little v. Comm'r of Internal Revenue*, 106 F.3d 1445 (1st Cir. 1993) (upholding 50% of the understatement of tax due to taxpayer's negligence or intentional disregard of the rules and regulations).

29

The government, having already had two bites at this apple,[14] now seeks to eat the whole fruit by confiscating the entire value of the property, well beyond the additional penalties the government already assessed.  Because the taxes, fees, penalties and interest were paid in full out of the tax sale, Defendants' retention of these excess funds crosses the line from the "remedial" purpose of reimbursement of lost revenues into punishment.

Thus, the statutes at issue are not remedial, and "can only be explained as also serving [a] retributive or deterrent purpose" as a punishment.

**B.  The Forfeitures at Issue are Disproportional to the "Offense" and are Excessive.**

The Supreme Court has held that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish."  *Bajakajian*, 524 U.S. at 334 (citing *Austin*, 509 U.S. at 622–623).

In *Sabri Properties*, the court acknowledged *Bajakajian* and further observed:

 [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense."  An excessive-fines claim requires the plaintiff must show both "(1) gross disproportionality; and (2) the disproportionality is of such a level that the punishment is more criminal than the crime.

*Sabri Properties*, 2019 WL 2052597, at *3 (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 501 (8th Cir. 2010)).  However, the Eighth Circuit has identified additional factors for a court to consider, including:

---

[14] The first bite resulted in the imposition of the property taxes; the second bite was the imposition of additional penalties, costs, and interest on top of those taxes.

disproportionality as the extent and duration of the criminal conduct, the gravity of the offense weighed against the severity of the criminal sanction, and the value of the property forfeited....  Other helpful inquiries might include an assessment of the personal benefit reaped by the defendant, the defendant's motive and culpability and, of course, the extent that the defendant's interest and the enterprise itself are tainted by criminal conduct.

*United States v. Bieri*, 68 F.3d 232, 236 (8th Cir. 1995); *see also United States v. Dodge*

*Caravan Grand SE/Sport Van, VIN No. 1B4GP44G2YB7884560*, 387 F.3d 758, 763 (8th

Cir. 2004).

The first question is whether the amount of the forfeiture bears some relationship to the gravity of the offense that it is designed to punish.  For Ms. Tyler, the offense was her failure to pay approximately $15,000 in delinquent taxes, including penalties and interest.  Hennepin County sold the property for $40,000, resulting in an additional "penalty" of nearly 200% of the original amount owing.[15]

The failure to pay property taxes is not a crime.  Assessing the initial penalties and interest should be enough of a deterrent to other property holders to ensure compliance with the property tax laws, and when they do not comply, the county can seize the property to satisfy their tax debt.  But allowing the government to keep 100% of the value of the property for a tax debt that is often a small fraction of that amount bears no relationship to the offense.

---

[15]When considering that Ms. Tyler's unpaid taxes were significantly less than the $15,000 she eventually owed, the size of the total penalty compared to that amount is likely well over 200%.  Assuming the original tax debt before penalties and interest was $10,000, the $40,000 amount the government ultimately seized grows to a staggering 300% penalty.

The next factor considers whether the degree of disproportionality is such that the punishment exceeds the crime.  That is clearly the case here, where, the value of the property far exceeds the original tax debt.  The factors demonstrate that keeping surplus funds or value, after the property owner's tax debt, penalties and interest have already been paid in full is clearly disproportionate and constitutes an excessive fine under the federal and state constitutions.

### III.  PLAINTIFF PROPERLY PLEADS A CLAIM FOR UNJUST ENRICHMENT.

Unjust enrichment is a common law claim not dependent upon an unconstitutional taking or excessive fine. Unjust enrichment can be pleaded in the alternative. *Mono Advert., LLC v. Vera Bradley Designs, Inc.,* 285 F. Supp. 3d 1087, 1091 (D. Minn. 2018).

Pleading unjust enrichment requires three elements be alleged: (1) defendant's receipt of a benefit; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the benefit was received under such circumstances that it would be inequitable for defendant to retain it. *Dahl v. R.J. Reynolds Tobacco Co*., 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).

Plaintiff pleads these elements. She pleads a benefit received by Defendants – the surplus.  (Compl. at ¶ 1, 113.)  Plaintiff also pleads Defendants' appreciation and knowing acceptance of a benefit. Plaintiff alleges Defendants initiated a foreclosure of her home, completed that foreclosure, and that the home had a surplus because it was worth more than the taxes. (Compl. ¶¶ 1, 5, 11, 32-35, 67, 113.)  Finally, Plaintiff alleges that it would be inequitable for Defendants to retain the surplus. (Compl. at ¶¶ 115-16.)

Defendants' inequity is confirmed by Hennepin County's website, which describes the

unfortunate taxpayers who, like Ms. Tyler, lose their property for taxes:

> Owners fall into financial trouble because of job loss, a sudden and
> expensive medical crisis, unexpected property expenses, and other reasons.
> Sometimes these two processes [mortgage foreclosure and tax forfeiture]
> are occurring at the same time.

Compl. at ¶42.

A largely defenseless and unrepresented segment of society, namely the elderly,

shut-ins, the mentally and physically infirm, make up the vast majority of owners with

forfeited property. (Compl. at ¶28, 42.) Plaintiff's situation is a case in point.  Defendants

took a 92-year-old widow's home, sold it for more than she owed in taxes, and used the

profits to fund Hennepin County, the City of Minneapolis, and Minneapolis Public

Schools pursuant to Minn. Stat. sec. 282.08(4)(iii).

The Pacific Legal Foundation ("PLF") has brought cases challenging Michigan's

tax forfeiture system, which is functionally identical to Minnesota's. The PLF's lead case

in Michigan, *Rafaeli*, was argued before the Michigan Supreme Court[16] and is pending

decision, presumably on or before July 31, 2020, the end of the Court's term.[17]

---

[16] Amicus briefs were filed on both sides of this case: the AARP and property rights
groups such as Buckeye Institute for Public Policy and the Center for Constitutional
Jurisprudence in support of the plaintiffs/appellants, and the Michigan Association of
County Treasurers supported the defendants/appellees. *See*
https://courts.michigan.gov/Courts/MichiganSupremeCourt/oral-arguments/2019-
2020/Pages/156849.aspx. (last visited on May 21, 2020).

[17] Similarly, journalists have described how these practices significantly disrupt the lives
of society's more vulnerable segments. Compl. ¶ 44, citing *The Other Foreclosure Crisis*,
July 10, 2012 https://www.nclc.org/issues/the-other-foreclosure-crisis.html (last visited
on May 21, 2020); Mahoney, Emily L., & Clark, Charles T., "*Arizona owners can lose*

Defendants argue that Hennepin County's retention of the surplus is, *as a matter of law*, not "inequitable." Defendants claim "inequitable" means "morally wrong" and that rather than being "morally wrong" when they took Plaintiff's home, Defendants were in fact "unwilling recipients of forfeited property." (D. Br. at 31.)

Initially, whether circumstances will support an unjust enrichment claim here is a fact question not suited for resolution on a Rule 12 motion. *See Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 304 F. Supp. 3d 815, 827 (D. Minn. 2018); *Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 989, 991 (D. Minn. 2014) (denying motion to dismiss).

Unjust enrichment is not necessarily limited to situations where defendant is "morally wrong." *See e.g., Khoday v. Symantec Corp.,* 858 F. Supp. 2d 1004, 1019 (D. Minn. 2012) ("To establish a claim for unjust enrichment under Minnesota law, a plaintiff must demonstrate 'that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.'") (citation omitted); *Genz-Ryan Plumbing & Heating Co. v. Weyerhaeuser NR Co., Weyerhaeuser NR Co.,* 352 F. Supp. 3d 901, 907 (D. Minn. 2018) (Denying motion to dismiss unjust enrichment claim where plaintiff alleged:

---

*homes over as little as $50 in back taxes*", The Arizona Republic, June 12, 2017, available at https://www.azcentral.com/story/money/real-estate/2017/06/12/tax-lien-foreclosures-arizona-maricopa-county/366328001/ (last visited on May 21, 2020). *See also*, *Cook County Makes Millions by Selling Property Tax Debt—But At What Cost?,* https://www.npr.org/local/309/2019/05/03/719971654/cook-county-makes-millions-by-selling-property-tax-debt-but-at-what-cost (last visited May 21, 2020).

"[Defendant] … has unjustifiably failed and wrongfully refused to pay Genz-Ryan for its past and continuing costs, losses, and damages as well as it lost business opportunities and profits arising from — or related to — the remediation work.").

But even if it were the test, "morally wrong" in the context of an unjust enrichment pleading is an inclusive term that encompasses Defendants' conduct. In *C.H. Robinson Worldwide, Inc. v. U.S. Sand, LLC,* No. CIV. 13-1274 JRT/FLN, 2014 WL 67957, at *6 (D. Minn. Jan. 8, 2014), the court stated:

> CHR alleges that '[i]t would be unjust to allow Defendants to retain the profits from their use of C.H. Robinson to transport and store the materials described herein without paying C.H. Robinson for its services.' (Compl. ¶ 49.) This allegation – that Sand received profits from CHR's work that it did not have to pay for – suffices to state a claim for unjust enrichment that could be considered "unjust" or "morally wrong." See *Twin City Constr. Co. of Fargo, N.D. v. ITT Indus. Credit Co.*, 358 N.W.2d 716, 719 (Minn. Ct. App. 1984) (lender was unjustly enriched when it refused to make final payment under a construction contract after contractor completed work); *Anderson v. DeLisle*, 352 N.W.2d 794, 796 (Minn. Ct. App. 1984) (jury reasonably found unjust enrichment where home buyer put $47,000 worth of improvements into home before finalizing contract for deed; sellers knew buyer could not fulfill contract and kept benefit of improvements).

A finder of fact could conclude Defendants' conduct here is morally wrong. Judge Kethledge described it as "theft." Theft is morally wrong.  In *Rafaeli*, Judge Berg called it "a manifest injustice."  *Rafaeli*, 2015 WL 3522546, at *3. Judge Friedman said in *Freed* that the practice is "unconscionable" and "theft." *Freed,* 2018 WL 5831013 at *2.  An unjust and "unconscionable" practice which could even be described as "theft," is "inequitable" and "morally wrong." For purposes of a motion directed at the sufficiency of the pleadings, Plaintiff has adequately alleged unjust enrichment.

IV.   **PLAINTIFF PROPERLY PLEADS A SUBSTANTIVE DUE PROCESS VIOLATION.**

Plaintiff alleges that while the taking and sale of her property may have been a justifiable means to assure the County's receipt of tax revenue, the failure to compensate her for the retained surplus is gratuitous, excessive and punitive, and violates Plaintiff's substantive due process rights under the U.S. and Minnesota constitutions. (Compl. at ¶ 119 (federal) and ¶ 124 (Minnesota)); *Id*. at ¶ 1 ("unnecessary"; ¶ 2 (*ultra vires* the constitutions); *Id*. at ¶ 20 "against all reason and justice'").

There are two different ways to establish a substantive due process claim:

First, the Government is forbidden from infringing upon certain 'fundamental' liberty interests to any degree—no matter what process is provided—unless the infringement is narrowly tailored to serve a compelling governmental interest.  Second, the state violates substantive due process when it engages in conduct that is so outrageous that it shocks the conscience or otherwise offends "judicial notions of fairness, [or is] offensive to human dignity.

*Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (internal quotations and citations omitted). *See also, Patel v. City of Sauk Ctr.*, 631 F. Supp. 2d 1139, 1148-49 (D. Minn. 2007).

Here, Plaintiff satisfies both tests.  First, the right to own property is a "fundamental right" under the Constitution. *Lucas v. Forty Fourth Gen. Assembly of State of Colo.*, 377 U.S. 713, 736 (1964), *McCoy v. Union Elevated R. Co.,* 247 U.S. 354, 365 (1918) ("The fundamental right guaranteed by the Fourteenth Amendment is that the owner shall not be deprived of the market value of his property under a rule of law which makes it impossible for him to obtain just compensation.").

As discussed above, Plaintiff has alleged Defendants took her property. (Compl. at ¶¶ 5, 40.) Defendants suggest that this is necessary to encourage "positive behavior of paying one's property taxes" and maintain public health and safety. (D. Br. at 22). Defendants bear the burden of establishing that the statute is narrowly tailored to serve a compelling state interest, and the court will subject the statute to strict scrutiny. *In re Linehan*, 594 N.W.2d 867, 872 (Minn. 1999). In this matter, Defendants have not carried their burden. *See*, *State v. Trahan*, 870 N.W.2d 396, 404 (Minn. Ct. App. 2015), *aff'd*, 886 N.W.2d 216 (Minn. 2016) ("We conclude that criminalizing the refusal to submit to a warrantless blood test 'relates to the state's ability to prosecute drunk drivers and keep Minnesota roads safe,' *Bernard*, 859 N.W.2d at 774, but it is not precisely tailored to serve that compelling state interest. It therefore fails strict-scrutiny review.").

Plaintiff also satisfies the second test. "The shocks-the-conscience test is, by its nature, imprecise." *See County of Sacramento*, 523 U.S. at 847, 118 S.Ct. 1708 ('[T]he measure of what is conscience-shocking is no calibrated yard stick....'); *Hough v. Shakopee Pub. Sch*., 608 F. Supp. 2d 1087, 1113 (D. Minn. 2009). Nonetheless, conduct at issue here "shocks the conscience," as evidenced by the multiple courts that have reviewed the conduct and, regardless of their ultimate ability or willingness to intervene, commented in strong negative terms about the unfairness of Defendants' practice. *See, e.g., Wayside Church*, 847 F.3d at 823–24 (Kethledge, J, in dissent) (Court dismissed case for lack of subject matter jurisdiction but Judge Kethledge noted in dissent "the gross injustice…caused by the kind of governmental action on display here" and that,

"[i]n some legal precincts [Defendants'] sort of behavior is called theft*.");* *Rafaeli*, 2015 WL 3522546, at *3; *Freed v. Thomas*, 2018 WL 5831013, at *2.

Defendants' argument that this case "closely parallels *Lukkason*." (D. Br. at 28 ) is mistaken.  There, a three-time drunk driver suffered forfeiture of his pickup, which was "used in committing [his] third DWI offense within five years." *Lukkason*, 590 N.W.2d at 305.  The Court of Appeals found that the forfeiture statute, which was "rationally related to the legitimate public purpose of getting intoxicated drivers off the streets," was constitutional. The government taking a recidivist drunk driver's vehicle pursuant to Minnesota forfeiture statutes that specifically contemplated such action, and which provided a mechanism for an appeal of the forfeiture, cannot be equated to the plight of Ms. Tyler, who committed no crime, whose property was not associated with any crime, and who had no statutory recourse to recoup her surplus.

## V.    PLAINTIFF PROPERLY PLEADS HER INVERSE CONDEMNATION CLAIM.

"Inverse condemnation" occurs when the government takes or substantially interferes with a property owner's rights yet refuses to acknowledge compensation is due, requiring the *owner* to obtain a writ of *mandamus* requiring that a condemnation proceeding be initiated.[18]

---

[18] Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *Agins v. Tiburon*, 447 U.S. 255, 257 (1980).

As stated in *Nolan & Nolan v. City of Eagan*, 673 N.W.2d 487 (Minn. Ct. App. 2003):

> The Minnesota Constitution requires the government to compensate a property owner when it takes the owner's property. Minn. Const. art. 1, § 13. A "taking" is any interference "with the possession, enjoyment, or value of private property." Minn. Stat. § 117.025, subd. 2 (2002). When the government has taken property without formally using its eminent domain powers, the property owner has a cause of action for inverse condemnation. *Alevizos v. Metro. Airports Comm'n of Minneapolis & St. Paul*, 298 Minn. 471, 477, 216 N.W.2d 651, 657 (1974).

Plaintiff alleges her property was taken by Defendants, and that they have failed to compensate her or initiate a condemnation proceeding. (Compl. ¶¶ 5, 40, 106-10.) Plaintiff properly alleges the elements of an inverse condemnation claim against Defendants. Their only objection to Plaintiff's inverse condemnation claim is to state no "taking" occurred and suggest that, if one did, it will be remedied by Plaintiff's takings claims.

True, if there was no taking, there may be no inverse condemnation claim. But if there *is* a taking, Plaintiff should be permitted to seek a writ of *mandamus* requiring Defendants to initiate a condemnation proceeding because greater relief may be available to Plaintiff under an inverse condemnation theory than under a taking theory. *See, e.g.,* Minn. Stat. § 117.045 (allowing recovery of attorney fees); Minn. Stat. § 272.68. (Overdue taxes not deducted from condemnation award.)

## **CONCLUSION**

The federal and Minnesota Constitutions allow government to take private property. But the power to take is subject to important limitations: the government must

pay just compensation for what it takes and cannot impose what amount to excessive fines.

When government takes property, but does not pay, and penalizes conduct that is not criminal with harsh forfeitures, especially forfeitures that victimize less fortunate segments of our society, it exceeds its powers and its actions are *ultra vires,* no matter if the practice is long-standing or sanctioned by statute.

Plaintiff has adequately pled takings, excessive fines and other claims under the U.S. and Minnesota Constitutions, as well as the common law, and her Amended Complaint should be sustained.

DATED:  May 22, 2020                    REINHARDT WENDORF & BLANCHFIELD

*s/Garrett D. Blanchfield*
Garrett D. Blanchfield (#209855)
Roberta A. Yard (#322295)
332 Minnesota Street, Suite W1050
St. Paul, MN  55101
Telephone:  651/287-2100
651/287-2103 (fax)
g.blanchfield@rwblawfirm.com
r.yard@rwblawfirm.com

Charles R. Watkins (*pro hac vice*)
GUIN, STOKES & EVANS, LLC
321 S. Plymouth Court
Suite 1250
Chicago, IL 60604
(312) 878-8391
charlesw@gseattorneys.com

Vildan A. Teske (#241404)
Marisa C. Katz (#389709)
TESKE, KATZ, KITZER & ROCHEL, PLLP
222 South Ninth Street

40

Suite 4050 |
Minneapolis, MN 55402
(612)746-1558
teske@tkkrlaw.com
katz@tkkrlaw.com

***Counsel for Plaintiff***